## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **INTERNATIONAL INTELLECTUAL** : | **CIVIL ACTION NO. 13-CV-____** |
| **PROPERTY, INC.** : | |
| 321 RICHARD RD. : | |
| YARDLEY, PA 19067 : | |
| and : | |
| **BRIAN R. WOLFF** : | |
| 321 RICHARD RD. : | |
| YARDLEY, PA 19067 : | |
| : | |
| *Plaintiffs*, : | |
| : | |
| v. : | |
| : | |
| **NORTECH SYSTEMS, INC.** : | |
| 1120 WAYZATA BOULEVARD EAST, : | |
| SUITE 201 WAYZATA, MN 55391 : | |
| : | |
| *Defendant*. : | |

## COMPLAINT FOR COPYRIGHT INFRINGEMENT

Plaintiffs Brian R. Wolff ("Mr. Wolff) and International Intellectual Property, Inc.

("IIPI") (collectively "Plaintiffs") complain against Defendant Nortech Systems, Inc.

("Nortech"), seeking monetary relief, alleging as follows:

1.      This is an action for copyright infringement of a professional

photographer's work arising under the Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.*,

and for removing copyright management information from the work in violation of the

Digital Millennium Copyright Act, 17 U.S.C. § 1202.

## JURISDICTION AND VENUE

2.      This court has subject matter jurisdiction over the copyright infringement

claim, with jurisdiction vested in this Court pursuant to 28 U.S.C. § 1331 (federal

question jurisdiction), 28 U.S.C. § 1338(a) (acts of Congress relating to copyrights), and

28 U.S.C.A. § 1367 (supplemental jurisdiction over Count III).

3.  This Court has specific personal jurisdiction over the Defendant pursuant to Fed.R.Civ.P. 4(k)(1)(A) because Defendant intentionally copied Mr. Wolff's work from the website of a licensee of Plaintiffs, United Defense Industries, located in York, Pennsylvania. Defendant directed its tortious actions toward Pennsylvania as it unlawfully copied by downloading protected work from a Pennsylvania business knowing that the copyright it infringed was registered to an owner located in Pennsylvania, and the effects of Defendant's infringement were felt in the forum state as the registered copyright proprietor suffered damages here.

4.  This Court also has general personal jurisdiction over the Defendant because it has continuous and systematic business in Pennsylvania. Specifically, upon information and belief, Defendant's northeast regional Field Sales Engineer, Thomas J. Zola, is located in, and operates out of, Pennsylvania. In addition, on information and belief, Defendant does significant business with clients in Pennsylvania, including but not limited to Plaintiff's former and current licensees, United Defense Industries (now BAE Systems), from whose site the unlawful copying took place on information and belief, and it regularly ships its products into Pennsylvania.

5.  Venue is proper pursuant to under 28 U.S.C. § 1391(b)(2)  because the defendant's omission to lawfully license the work from IIPI occurred in this District and the property that is the subject of the action is situated within the District.   In the alternative, venue is property pursuant to Under 28 U.S.C. § 1400(a) as Defendant may be found in this District where it is subject to the Court's jurisdiction.

## THE PARTIES

6.     Plaintiff, Brian R. Wolff ("Mr. Wolff') is a professional free-lance photographer with a principal place of business in Yardley, Pennsylvania.

7.     Mr. Wolff has over 35 years of experience as a professional photographer whose clients have included the Los Angeles Times, Time Magazine, Paris Match, the US Navy, Lockheed Martin, BAE Systems, formally United Defense, The Navy League, Raytheon, DRS Technologies, and many other editorial and commercial clients.

8.     Mr. Wolff's images have also appeared in magazines world-wide as covers, feature editorials and advertisements such as *Smithsonian, Life, Paris-Match, Le Figaro,* and *Stern.* Mr. Wolff's photographic subjects are diverse and have included Barbie Dolls for the cover of Smithsonian, shooting portraits of noted celebrities, prominent scientists and authors, landing a helicopter in an active volcano, and documenting all aspects of the U.S. Military as the Photographer in Residence for the U.S. Naval Institute Press.  He has developed a special market niche as photographer of naval subjects, defense industries and high technology that he licenses for a variety of uses including Annual Reports of corporations in the defense industry.   Mr. Wolff's works are commercially available as stock photography as well as fine art prints. Mr. Wolff has also published two photographic books on the U.S. Navy.  One, titled FROM THE SEA: THE U.S. NAVY AND MARINE CORPS, INTO THE 21ST CENTURY (Osprey Publishing, Ltd., 1997), was co-authored with John Alexander, Commander USN, Ret.  The second, RIDERS OF THE STORM: A PHOTOGRAPHIC TRIBUTE TO AMERICA'S SURFACE WARRIORS (International Intellectual Property, Inc., 2000),

was authored by Mr. Wolff with an Introduction by Michael G. Mullen, Admiral, USN,
Ret., later 17th Chairman of the Joint Chiefs of Staff.

9.      Mr. Wolff continues to work as a photographer and continues to earn his
livelihood, in substantial part, by licensing others to use the images he owns that he
created during an active career of over 35 years in photography, much relating to the
defense industry.

10.      Plaintiff, International Intellectual Property, Inc. ("IIPI") is a Pennsylvania
Corporation.  IIPI is the exclusive licensing agency for Mr. Wolff's works.  Its principal
place of business is 321 Richard Road, Yardley, PA 19067.

11.      On September 1, 1996, Mr. Wolff granted IIPI the exclusive right to
license use of Mr. Wolff's copyrighted works.  *See* Exclusive Copyright License at
Exhibit "1."  In its capacity as exclusive licensing agent, IIPI is responsible for entering
into all agreements governing the use of Mr. Wolff photographs, including but not
limited to negotiating back licenses and enforcement actions for non-licensed use.

12.      Defendant, Nortech Systems, Inc., is a Minnesota corporation with a
principal place of business at 1120 Wayzata Boulevard East, Suite 201 Wayzata, MN
55391.  On information and belief, the Northeast Regional Filed Sales Engineer for
Aerospace Systems, a division of Nortech, is located in, and operates out of,
Pennsylvania.

13.      On information and belief, Nortech manufactures wire harnesses, cable
and electromechanical assemblies, printed circuit board assemblies, and higher-level
assemblies for a wide range of commercial and defense industries. Nortech also designs,

manufactures, and markets display monitors for medical imaging, document imaging, radar, and industrial applications.

## MR. WOLFF CREATED THE PROTECTED WORK
## AT GREAT EXPENSE AND RISK IN ORDER TO EXPLOIT
## HIS COPYRIGHT THEREIN THROUGHOUT ITS TERM

14.     Mr. Wolff has long and unusual professional relationship with the U.S. Navy.  He has often agreed to exclusively photograph incidents or events relating to the military and many other subjects in order to acquire ownership of the resulting images. He has always made abundantly clear that he retained ownership of his work and that the acquisition of exclusive rights in images of the military subjects was part – indeed, often the main part – of the consideration for his services, and he has consistently declined job offers where the client required assignment of copyright in the work.   The business model of his career as an independent photographer was to own his inventory of works and license them following the initial use for which they were made.  He does not recall ever having released the copyright in his work to a client.  The Navy and/or its contractors get licenses to use of his work that are usually restricted to specific purposes or to non-commercial editorial uses.  The high technical expertise of his work executed under often-challenging conditions, and the aesthetic quality of his product, render his work suitable for exclusive licensing used across different industries and media platforms.

15.     In July, 2000, Mr. Wolff took a dramatic photograph of the test firing in 2000 of a 5-inch, Mk 45 Mod 4 Naval Gun System on board the U.S.S. Churchill destroyer (the "Protected Work").  *See* copy of the Protected Work at Exhibit "2."

16.    Mr. Wolff learned of the test through his military and defense industry contacts.  His first license agreement was with United Defense Industries to take photographs of the test.   A license agreement gave United Defense a one-time, non-exclusive first publication right for use of the images for consideration of $18,750.00. The License Agreement specifically provided that "COPYRIGHT TO THE IMAGES REMAIN THE PROPERTY OF BRIAN R. WOLFF". *See* August 15, 2000 *License Agreement/Invoice No. 69743 at Exhibit "3."*

17.    Mr. Wolff expended much time getting permission for the shoot, travelling several times to Washington and coordinating with the ship's Commander in Bath, Maine, and with engineers and testers at United Defense and Bath Iron Works, and he spent five days at sea.  He was able to create the work because he had technical and aesthetic expertise in wiring remote and hand-held cameras for scientific and engineering tests, but also creates dramatic images suitable for public affairs purposes, not just record shots.

18.    The Protected Work is dramatic and unique because the shells used in the test were over-charged with explosives for purposes of a structural integrity test conducted by the Naval Sea Systems Command ("NAVSEA") in conjunction with engineers employed by United Defense, Inc., and Bath Iron Works.  Traditionally, from the era of the American Revolution through the time of Iowa-class battleships, the iconography of naval warfare turns on images of naval guns "blazing" with visible flames from gun barrels.  This is how artists have projected an emotionally-charged impression of naval power.  However, to avoid visual detection, modern naval guns do not "blaze." If properly captured on film, the over-charged structural integrity test on the Churchill

would afford a rare – possibly, the last – chance to depict a modern war ship with its gun blazing.

19.     In order to take the desired image, Mr. Wolff spent several days preparing including hard-wiring a rare, high speed, high frame frequency Hulcher camera designed for the NASA space program. The special camera was needed to catch the blazing fireball because today's propellants for modern, 5-inch guns have a much faster combustion rate than the old 16-inch guns found on Iowa-class battleships. The old guns have a heavier load of explosives that could be captured using a regular camera at high shutter speed. The new technology presents greater challenges, and the desired image could be "missed" in an instant by a less expert photographer of this one-time event.

20.     In addition, Mr. Wolff operated a second camera were he stood on the bridge. All ship's personnel were ordered inside during the test due to the risk of injury from the possible explosion of a gun charged much beyond its intended design. Mr. Wolff and one crew member assigned to monitor his safety were the only persons allowed out on a weather deck during the test, and the crew member took shelter behind the bridge wing bulkhead at the time of the blast. Mr. Wolff alone, in flack jacket and helmet, was exposed. His silhouette on the bridge is recognizable in an enlargement of the front-on image. *See* enlargement at Exhibit "4."

21.     The force of the gun explosion blew the lens hood off the lens which was attached to the Hulcher camera that Mr. Wolff had obtained from its owner, a photographer who specialized in stunts. Mr. Wolff alone was liable for this expensive equipment the loss of which would have been a financial disaster for him.

22.     Processing the high-tech images of the test took Mr. Wolff over a week. NAVSEA and United Defense engineers told Mr. Wolff that they had had difficulty capturing and predicting the debris field of particle matter during test firings using regular cameras, and had resorted to computer modeling without full success. They had never had a photograph of the quality that Mr. Wolff took, and his image permitted them to visualize the actual debris field for the first time.

## MR. WOLFF EXPLOITED HIS COPYRIGHT IN THE IMAGE

23.     Mr. Wolff registered his images from the shoot titled No. 200719 USS Winston Churchill as copyright number VAu 1-079-274 effective August 14, 2000. *See* Certificate of Registration at Exhibit "5."

24.     IIPI licensed the use of the Protected Work to NAVSEA and the in-service professional publication for servicemen, *All Hands Magazine*, without payment. The image was licensed for editorial use by *Stern* in Germany, *The Daily Mail* and the *London Sunday Times* in Britain. Over time, the Protected Work was licensed for public relations use to commercial users United Defense (several licenses), General Dynamics, L3 Communications Holdings, Inc., EDO Corporation, General Electric, Alliant Techsystems, Inc., and BAE Systems. BAE Systems has continued to license the Protected Work for specific limited uses.

25.     IIPI has continued to license the Protected Work for which a demand remains. It was recently licensed to one customer, for $7,920.00 annually for two years, got specific uses which are typically restricted to licensees' trade ads, brochures and web sites and for press releases for editorial use within the trade. *See* May 25, 2012 Stock Photo Invoice/License No. 70358 at Exhibit "6."

26.     The Grant of Rights provision in IIPI's License Agreement reserves all rights not expressly granted.  Mr. Wolff requires his licensees to notice his copyright when publishing his licensed works.  *Id.*

## NORTECH INFRINGED PLAINTIFFS' COPYRIGHT

27.     In at least one instance known to Mr. Wolff, Nortech copied and published Mr. Wolff's Protected Work without authorization and without payment of a licensing fee.  Nortech illegally copied the image and published it on Nortech's website under the heading "Defense Applications."  *See* screen shot of website as of August, 2010, at Exhibit "7."  That infringing image actually contained Mr. Wolff's copyright notice, though Nortech altered it by reducing in order to render Mr. Wolff's notice illegible even when re-enlarged.  *See* enlarged screen shot at Exhibit "8."

28.     When Plaintiffs discovered the infringing use, Mr. Wolff, and later his legal counsel, made numerous attempts to amicably negotiate a back license for the infringing uses. Regrettably, Nortech refused to make any financial amends whatsoever for its infringing use of Plaintiffs' property.

29.     On discovering Nortech's infringement, IIPI immediately wrote to Nortech on August 20, 2010, demanding that Nortech remove the image from its web site and account for its use.  IIPI offered to issue back-licenses for such unauthorized uses. *See* August 20, 2010 email message from Mr. Wolff to Christine Meidinger at Exhibit "9."

30.     After several additional inquiries by Mr. Wolff, Nortech's Chief Financial Officer wrote:

> I'm Northech's CFO and we've removed the image you referenced in an
> e-mail to Christine from our web site.  Our procedure on trade marks,

names, pictures and images used on our web site is to gain approval from
our customers.

*See* August 30, 2010 email message from Richard Wasielewski to Mr. Wolff at Exhibit

"10." That apparently meant that Nortech purported to have received approval from one

of its customers to copy Mr. Wolff's Protected Work from the customer's publication or

web site without any license from the owner.

31.    In response, Mr. Wolff again wrote Mr. Wasielewski explaining that

Nortech's copying was not excused by its contention that a third party authorized it to

infringe, and again offered Nortech "a chance to deal with us directly..." to back-license

its unlicensed uses. *See* September 1, 2010 email message from Mr. Wolff to Mr.

Wasielewski at Exhibit "11."

32.    Nortech refused to provide an accounting or payment, peremptorily

stating, "we've provide[d] you all we have already." *See* September 1, 2010 email

message from Mr. Wasielewski to Mr. Wolff at Exhibit "12."

33.    On information and belief, Nortech copied the Protected Work from a

2005 United Defense Industries web page for press releases that was later posted on the

public relations website of BAE Systems, the successor to United Defense. *See* June 16,

2005 press release at Exhibit "13." Plaintiffs believe that image was the only instance in

which the Protected Work ever appeared in precisely the form copied and used by

Nortech. That image contained a copyright notice in Brian R. Wolff's name.

34.    As noted above in paragraph 15, the license at Exhibit "3" granted United

Defense permitted use of the Protected Work pursuant to an agreement that specifically

provided that "COPYRIGHT TO THE IMAGES REMAIN THE PROPERTY OF

BRIAN R. WOLFF." United Defense subsequently licensed additional uses of the

Protected Work, for yearly periods, pursuant to subsequent License Agreements restricting authorized uses to United Defense's trade ads, brochures, annual report, trade show display, and public relations publications disseminated for editorial use in trade magazines and papers only.  While United Defense and later BAE had a right to authorize third party uses of the Protected Work, that right was limited to trade journal editorial use only.  The license stipulated that "All images will carry a copyright notice.  Brian Wolff retains all copyrights to all images."  In 2001, United Defense contracted to pay $6,000 to license such restricted uses.  *See* March 8, 2001 License Agreement/Invoice No. 69769 at Exhibit "14."

35.     Contrary to Mr. Wasielewski's claim that Nortech received "permission" from its customer for its infringing use of the Protected Work, Plaintiffs believe that United Defense and its successor, BAE Systems, have complied with their license agreements.  When United Defense distributed copies pursuant to its license, it expressly limited any reuses to the trade editorial purposes that Mr. Wolff authorized.  *See* cassette case with usage notice at Exhibit "15."

36.     On information and belief, Nortech copied the Protected Work from United Defense's public relations web page that was and still is posted by BAE.  United Defense and BAE there set forth a "Legal Notice" relating to the posted images.  *See* BAE web page displaying the Protected Work at Exhibit "16."  The Legal Notice on the very page from which Plaintiffs believe their work was taken by Nortech made two points.  First, it stated that BAE granted only the right to copy its publications "for personal, non-commercial use."  Second, it warned that BAE offered no warranty for the notice authorizing personal use, limited though it is.

37.     Further copyright management information ("CMI") was and is embedded in metadata for the Protected Work.   When Nortech copied the Protected Work, it simultaneously copied CMI metadata embedded in the Protected Work that sets forth the following Copyright Notice: "©Brian R. Wolff / www.iipinet.com, all rights reserved." *See* metadata for the Protected Work at Exhibit "17."

38.     On information and belief, Nortech removed that metadata noticing Mr. Wolff's copyright from the infringing image that Nortech published on its website in order to conceal its infringement.  In addition to removing the CMI metadata, Nortech altered the visual copyright notice on the Protected Work by reducing it so that it became illegible.

39.     Far from being innocently misled by a customer having fraudulently granted Nortech "approval" to copy the Protected Work, Nortech willfully disregarded the copyright restrictions that BAE Systems redundantly noticed in its "Legal Notice," in the copyright notice on the face of the Protected Work, and in embedded metadata.  In truth, Nortech intentionally infringed on Plaintiffs' property rights in the Protected Work in disregard of clear copyright notices, and it altered visible CMI and, on information and belief, removed embedded CMI to avoid detection of its illegal conduct.  Then, when the infringement was discovered, it refused to explain, account or negotiate a back-license for its infringing uses.

40.     Mr. Wolff retained counsel, Dan Nelson of Nelson & McCulloch, LLP, in New York, NY, who was directed to counsel for Nortech, Bert M. Gross, in Minneapolis, MN.  Mr. Nelson made numerous attempts to commence negotiations with Nortech through Mr. Gross.  Following its client's lead, Mr. Gross refused to respond.

## COUNT I
(Copyright Act Infringement)

41.     Plaintiffs incorporate by reference all the allegations of paragraphs 1 through 40.

42.     Mr. Wolff is the author and copyright owner of the Protected Work.

43.     Plaintiff IIPI owns the exclusive right to license the copyrighted Protected Work.

44.     Defendant has reproduced, displayed, distributed or otherwise copied the Protected Work without Mr. Wolff or IIPI's license or authorization.

45.     The actions and conduct of Defendant as described above infringe upon the exclusive rights granted to photographers under 17 U.S.C.A. 106 to display, reproduce and distribute their work to the public.

46.     Such actions and conduct constitute copyright infringement under the Copyright Act of 1976, 17 U.S.C.A. 501

47.     Plaintiffs have complied in all respects with 17 U.S.C. §§ 101 *et seq.*, and secured and registered the exclusive rights and privileges in and to the copyrights of the above-referenced works pursuant to 17 U.S.C. § 412.

48.     Plaintiffs suffered actual damages consisting of the loss of license fees that IIPI receives for licensing the Protected Work.

49.     On information and belief, Plaintiffs allege that, as a direct and proximate result of their wrongful conduct, Defendant realized profits and other benefits attributable to its infringing use of the Protected Work.

50.     Defendant's infringement was intentional.  Though Plaintiffs contacted Defendant and offered to back-license the infringing uses, as if Defendant's use thereof

had been honest, Defendant refused to either to account for its unlawful uses or to negotiate compensation to Plaintiffs for its infringing uses, thereby displaying its actual dishonest intentions.  Plaintiffs have satisfied all the requirements for an award of the maximum statutory damages per infringing act.

## COUNT II
### (Violation of Digital Millennium Copyright Act)

51.    Plaintiffs incorporate by reference all the allegations of paragraphs 1 through 50.

52.    Defendant intentionally removed copyright management information from copies of the Protected Work, and reduced the visual copyright notice to make it illegible, knowing that it had removed or altered CMI without authority of the copyright owner or the law, and knowing or having reasonable grounds to know, that it would thereby enable, facilitate, or conceal its infringement of Plaintiffs' rights in their copyright.

53.    After removing and altering Plaintiffs' CMI from a copy of the Protected Work in order to conceal its infringement, Defendant illegally published the Protected Work at least once on its website and, on information and belief, elsewhere.

54.    Defendant damaged Plaintiffs by its infringing display of the Protected Work and by concealing that infringement by removing the identifying CMI.

## COUNT III
### (Tortious Interference With Business Relationships)

55.    Plaintiffs incorporate by reference all the allegations of paragraphs 1 through 54.

56.    IIPI has a valid contract with Mr. Wolff to exclusively license his work. Both Plaintiffs have a reasonable expectation of prospective beneficial economic relations deriving from that agency.

57.    The terms of the contracts and expectations of future economic relations, as described above, are valuable to IIPI and to Mr. Wolff, and form the basis of their business with one another.

58.    Nortech's intentional wrongful acts, as described above, were committed with clear notice of that relationship and with intent, knowledge, and reason to know that such acts would interfere with, disrupt, and damage the business relationships between IIPI and Mr. Wolff.

## RELIEF

WHEREFORE, Plaintiffs request judgment against the Defendant for:

**i.    Copyright Infringement**:

1.    A finding that Defendant infringed the Plaintiffs' copyright interests in the Protected Work by copying and publishing it for commercial purposes without any license;

2.    Pursuant to 17 U.S.C. §504(b), actual damages and disgorgement of all of Nortech's profits attributable to the infringement as provided by the Copyright Act or, in the alternative, statutory damages pursuant to 17 U.S.C. §504(c)(1) or (2), whichever is larger;

3.    An award of Plaintiffs' attorney's fees and costs due for intentional infringement pursuant to 17 U.S.C. §505;

4.    An order pursuant to 17 U.S.C. §§ 502 and 503 impounding or enjoining

Nortech to turn over to Plaintiffs all copies of the Protected Work claimed to have been made or used in violation of the exclusive right of the copyright owner; all plates, tapes, film negatives, or other articles by means of which such copies may be reproduced; and records documenting the manufacture, sale, or receipt of things involved in any such violation.

      **ii.**     **Removing Copyright Management Information**:

     5.     A finding that Defendant violated the Digital Millennium Copyright Act, 17 U.S.C. 1202, by knowingly removing Plaintiff's CMI attached to the Protected Work in order to conceal its infringement of the Plaintiffs' copyright interests in the Protected Work by copying and publishing it for commercial purposes without any license;

     6.     Pursuant to 17 U.S.C. §1203(c)(2), the actual damages suffered by the Plaintiffs as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages or, in the alternative, statutory damages pursuant to 17 U.S.C. §1203(c)(3)(B), whichever is larger;

     7.     An award of Plaintiffs' attorney's fees and costs pursuant to 17 U.S.C. §1203(b)(4) and (5);

     8.     An order pursuant to 17 U.S.C. §1203(b) (2) enjoining Nortech to turn over to Plaintiffs any device or product that is in the custody or control of Nortech that the court has reasonable cause to believe was involved in a violation 17 U.S.C.A. § 1203.

      **iii.**     **Intentional Interference With Contractual Advantage:**

     9.     As a result of the tortious interference with business relationships as described above, IIPI and Mr. Wolff are entitled to damages in an amount to be proven at trial including but not limited to actual damages and punitive damages.

**iv.**     **Generally:**

10.     Such other relief as the Court deems just and proper.

Respectfully submitted,

**SPECTOR GADON & ROSEN, P.C.**

By: _____
Bruce Bellingham
1635 Market Street, 7th Floor
Philadelphia, PA 19103
(215) 241-8916
*bbellingham@lawsgr.com*
*Attorney for Plaintiff*

January 25, 2013

1493584-3                                     17